## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 03 2018, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvonne M. Spillers
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

George Guido
Tate A. Henvey
Graly & Guido Law Office, LLC
Fort Wayne, Indiana

David C. Pricer
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Paternity of V.A.C. Benjamin T. Colburn, *Appellant-Petitioner,* <br><br> v. <br><br> Raliza V. Pashova, *Appellee-Respondent.* | July 3, 2018 <br><br> Court of Appeals Case No. 17A03-1711-JP-2722 <br><br> Appeal from the DeKalb Circuit Court <br><br> The Honorable Kurt B. Grimm, Judge <br><br> Trial Court Cause No. 17C01-1312-JP-109 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, Benjamin Colburn (Father), appeals the trial court's Order denying his motion for modification of custody of his minor child, V.A.C. (Child), in favor of Appellee-Respondent, Raliza Pashova (Mother).

We affirm in part, reverse in part, and remand with instructions.

# ISSUES

Father raises five issues on appeal, which we consolidate and restate as the following four issues:

(1) Whether the trial court abused its discretion by denying Father's motion for modification of joint legal custody to sole legal custody;

(2) Whether the trial court abused its discretion by increasing Mother's parenting time;

(3) Whether the trial court abused its discretion in admitting certain evidence; and

(4) Whether the trial court correctly calculated the child support obligation.

# FACTS AND PROCEDURAL HISTORY

On July 29, 2011, Child was born out of wedlock to the parties. On December 23, 2013, Father filed a petition to establish paternity. On December 30, 2013, the trial court adopted the parties' Agreed Entry Concerning Paternity of Child, Custody, Parenting Time and Support (Agreed Entry). The Agreed Entry

established Father's paternity to Child; joint legal and physical custody of Child, with Father being primary custodian, and Mother exercising parenting time of "roughly three and one-half (3½) days per week." (Appellant's App. Vol. II, p. 14).

[5] On April 24, 2015, Mother filed a Motion to Modify Custody, Parenting Time, Support, and Support-Related Matters. On June 2, 2015, Mother filed a motion for mediation. On June 9, 2015, Father filed his Verified Petition for Modification of Parenting Time and Child Support. On June 10, 2015, the trial court ordered the parties to mediate. On September 2, 2015, pursuant to the mediation, the trial court entered a mediation agreement (Mediated Agreement), which maintained the parties' joint legal and physical custody over the Child. Father was again appointed as the primary custodian, and Mother's parenting time was ordered as follows: every weekend from Friday at 1:00 p.m. until Sunday at 6:00 p.m., and every Monday from 1:00 p.m. until Tuesday at 6:00 p.m. The Mediated Agreement resolved that when the Child began kindergarten, Mother's parenting time would automatically be modified—*i.e.*, Mother's parenting time would be every weekend from Friday after school until Sunday at 6:00 p.m. and every Tuesday after school until 7:30 p.m. In addition, the parties settled that the Child would attend preschool at Zion Lutheran Church, and that beginning August of 2016, the Child would be enrolled in Oak Farm Montessori School (Oak School).

[6] On April 11, 2016, Father filed his Verified Emergency Motion for Order to Return the Child to Father (Emergency Motion). Father alleged that on March

25, 2016, when Mother arrived at his home to pick up the Child, he noticed that Mother "appeared intoxicated, unsteady on her feet and high" and "[f]or the [C]hild's safety, Father refused to allow the [C]hild to travel with Mother." (Appellant's App. Vol. II, p. 24). Father additionally claimed that when he went to pick the Child from Mother's home on Tuesday April 5, 2016, Mother explicitly refused to return the Child to him, and a verbal altercation ensued. Furthermore, Father alleged that the next day, Wednesday April 6, 2016, Mother did not take the Child to preschool because Mother stated that she was recovering lost parenting time. On the same day, the trial court found that an emergency existed and granted Father permission to pick up the Child from Mother's home.

[7] When Father arrived at Mother's home, the Child was inside the house. Mother and Mother's fiancé, Mark Johnson (Johnson), were outside the house. Father believed that a verbal altercation would arise, so Father used his cell phone to record the interaction he had with Mother and Johnson. Father first inquired as to the Child's whereabouts. Instead of responding to Father's question, Mother questioned Father on his projected summer parenting schedule. Father expressed to Mother that he did not have the dates written down. Johnson deemed Father's response impolite, and a verbal argument ensued. In an attempt to dissolve the confrontation between Father and Johnson, Mother offered Father the Child's bag so that Father could leave. While the three were arguing, the Child exited the house and was now playing in the yard; however, the Child was not close enough to hear the altercation.

Shortly after presenting the Child's bag to Father, Mother summoned the Child. Also, she instructed Johnson to stop arguing with Father since she did not want the Child to witness the confrontation.

[8] On April 13, 2016, Father filed a Verified Motion to Modify Legal Custody, Parenting Time, Support, and Support-Related Matters. Father's motion alleged that "there is a substantial change in circumstances, and the [C]hild's best interest are served with a modification of legal custody and parenting time." (Appellant's App. Vol. II, p. 28). In addition, Father alleged that "he is concerned about Mother's sobriety and ability to safely care for their [Child]. [Johnson] has criminal convictions for domestic violence, alcohol-related convictions[,] and criminal allegations of sexual assault[,] and Mother is aware of these things and still allows [Johnson] to supervise the [C]hild alone." (Appellant's App. Vol. II, p. 28). Finally, Father claimed that it would be in the Child's "best interest . . . that he has legal custody and primary . . . physical custody, and that Mother's parenting time should align with the 2013 Indiana Parenting Time Guidelines." (Appellant's App. Vol. II, p. 28). The next day, the trial court issued a notice for a status hearing to be conducted on May 31, 2016.

[9] On the scheduled hearing date, Father appeared with counsel, however, neither Mother nor her counsel attended. Despite being termed as a status hearing, the trial court conducted a fifteen-minute hearing on Father's Verified Motion to Modify Legal Custody, Parenting Time, and Support, and Support-Related Matters. After Father was sworn, the trial court asked Father, "[A]s a read

this[,] you are requesting a modification of the Legal Custody designation to make you full legal custodian, is that correct?" (Tr. Vol. I, p. 4). Father replied, "Yes, it is." (Tr. Vol. I, p. 4). Father then testified that communication between him and Mother "hasn't been . . . . easy." (Tr. Vol. I, p. 5). The trial court subsequently asked Father, "[A]re you able to come to joint agreements on issues such as education or religion, healthcare, things of that sort with Mother[]?" and Father stated, "[I]t is difficult to do." (Tr. Vol. I, p. 6). Father added that while he and Mother agreed on issues pertaining to the Child's healthcare; they significantly disagreed as to where the Child would be enrolled for kindergarten. At the close of the hearing, the trial court pronounced that that it would be granting Father's request—*i.e.*, "[T]hat dad gets legal custody and primary physical custody and mom gets parenting time according to the Parenting Time Guidelines." (Tr. Vol. I, p. 9). The trial court also expressed that it would shortly be issuing an accompanying written order on the same.

[10] Pursuant to the Mediated Agreement of September 2015, Father attempted to enroll the Child at Oak School for kindergarten, however, he was unsuccessful. While awaiting the trial court's written order awarding him sole legal custody of the Child, Father, without Mother's input, enrolled the Child at J.E. Ober, a public school located close to his home.

[11] On June 1, 2016, Mother's counsel filed a motion for relief from judgment or in the alternative, a motion to correct error. In that motion, Mother's counsel explained that he failed to enter an appearance for Mother prior to the May 31st status conference "because he was already scheduled to be in a full-day final

divorce hearing in Dekalb County." (Appellant's App. Vol. II, p. 31). Notwithstanding the scheduling oversight, Mother's counsel argued that any order issued pursuant to the May 31st status hearing would be a default order, and the trial court should set it aside and reschedule the matter for another status hearing.

[12] Pursuant to the May 31st status hearing, on June 8, 2016, the trial court issued a default order (Default Order), holding that there had been a substantial change in one or more of the factors enumerated in Indiana Code section 31-17-2-8.[1] Accordingly, the trial court granted Father sole legal and physical custody of the Child, with Mother having parenting time in accordance to the Indiana Parenting Time Guidelines. In addition, the trial court ordered the parties to pay child support based on their incomes. Following that order, the same day, Mother's counsel filed an Amended Motion for Relief from Judgment or in the Alternative a Motion to Correct Error. Mother's counsel reiterated the scheduling conflict he had during the May 31st status hearing. Mother's counsel once more argued that because the Default Order related to the parties' custodial rights, the order should be set aside, and both parties should engage in a full evidentiary hearing. On June 17, 2016, Father filed an opposing motion, alleging that Mother received notice of the status hearing, and because Mother

---

[1] This statute applies to modification of custody in dissolution actions. Custody modifications in paternity actions are governed by Article 14 of Title 31. Although the citation to Indiana Code section 31-17-2-8 is technically incorrect, the error is of no consequence here because Indiana Code section 31-17-2-8 and Indiana Code section 31-14-13-2 are identical in substance, and nearly so in wording.

did not have an attorney on record, the trial court had no reason to know if Mother was being represented by an attorney.

[13] On October 18, 2016, the trial court conducted a hearing on Mother's Amended Motion for Relief from Judgment, or in the Alternative a Motion to Correct Error. On November 14, 2016, the trial court issued an order, holding that the Default Order would be "temporary until such time that the parties can appear and participate in a full evidentiary hearing." (Appellant's App. Vol. II, p. 50). The trial court subsequently directed the parties to conduct discovery, participate in mediation, and seek a pre-trial conference prior to an evidentiary hearing on Father's Verified Motion to Modify Legal Custody, Parenting Time, Support, and Support-Related Matters.

[14] On February 28, 2017, Mother by counsel, took Father's deposition. On March 21, 2017, Father, Father's attorney, and Mother's attorney, attended mediation; but, Mother failed to appear. The same day, Father filed a Motion to Award Reasonable Attorney and Mediation Fees. Instead of granting Father's motion for fees, on March 28, 2017, the trial court ordered the parties to participate in a second mediation. On April 6, 2017, the parties returned for a second mediation, and at the end of the session, the parties entered into a Partial Mediated Agreement which only addressed parenting time for the Summer of 2017. On May 9, 2017, Father by counsel, took a deposition of Johnson, Mother's fiancé. On August 22, 2017, Father by counsel, deposed Mother. On August 25, 2017, the parties entered into an agreement to dismiss Father's

pending motions for discovery sanctions, and the award of attorney fees and mediation fees.

[15] On October 11, 2017, the trial court conducted an evidentiary hearing on Father's Verified Motion to Modify Legal Custody, Parenting Time, Support, and Support-Related Matters. At the close of the evidence, the trial court ordered the parties to file their proposed findings of fact. On November 8, 2017, the trial court issued its findings of fact and conclusions thereon denying Father's motion to modify legal custody. However, the trial court increased Mother's parenting time, and child support was ordered. That order was subsequently amended on November 15, 2017, however, it maintained the same directives.

[16] Father now appeals.[2] Additional facts will be provided as necessary.

---

[2] While this appeal was pending, on February 1, 2018, Mother was stopped for speeding after dropping the Child at school. During the traffic stop, Mother was found in possession of paraphernalia and marijuana. Mother was subsequently charged. Based on Mother's new criminal charges, on February 12, 2018, Father filed a Verified Motion for Emergency Hearing to Modify Parenting Time. On February 28, 2018, the trial court correctly determined that it lacked jurisdiction to hear Father's motion. Father appealed to this court, but we denied Father's request; however, following Father's motion for reconsideration, we remanded the matter to the trial court. In our remand order, we gave the trial court limited jurisdiction, *i.e.*, "for the limited purpose of holding a hearing, within fifteen (15) days of the date of his order, to reconsider parenting time in light" of Mother's arrest." On April 17, 2018, the trial court held a timely hearing, strictly limiting itself on whether Mother's criminal charges demanded modification or termination of parenting time as stipulated by the November 15, 2017 Order. On April 20, 2018, the trial court issued an order, complete with findings of fact and conclusions thereon, maintaining Mother's parenting time. Father has not appealed from the April 20, 2018 order.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[17] The trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). We apply a two-tiered standard of review to such cases. *Marion Cty. Auditor v. Sawmill Creek, LLC*, 964 N.E.2d 213, 216 (Ind. 2012). First, we determine whether the evidence supports the findings of fact and second, we determine whether the findings support the judgment. *In re Adoption of A.S.*, 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), *trans. denied*. Indiana's appellate courts "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." T.R. 52(A). "A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 944 (Ind. Ct. App. 2006).

## II. *Modification of Legal Custody*

[18] Father argues that the trial court abused its discretion by denying his motion for modification of joint legal custody to sole legal custody. Father claims that the trial court "must have recognized a substantial change in circumstances or else the [trial] court would not have modified parenting time so substantially, as it did." (Appellant's Br. p. 33).

[19] At the onset, we find that Father confuses the legal standard of reviewing modification of custody and modification of parenting time. *See Miller v. Carpenter,* 965 N.E.2d 104, 110 (Ind. Ct. App. 2012) (holding that while Indiana

Code section 31-14-13-2 (custody modification statute) requires a showing of the best interests of the child and a substantial change, whereas Indiana Code section § 31-14-14-2 (parenting time modification statute) requires only a showing that of the best interest of the child). Notwithstanding Father's attempt to conflate the legal standards of review between modification of custody and parenting time, we address his claim.

[20] In *"In re Paternity of G.G.B.*, 80 N.E.3d 264, 271 (Ind. Ct. App. 2017), *trans. denied*, we noted that the trial court must consider three statutes when modifying legal custody in a paternity case: Indiana Code Sections 31-14-13-6, -2, and 2.3(c). Indiana Code Section 31-14-13-6 states in relevant part:

> (a) The court may not modify a child custody order unless:

> (1) the modification is in the best interests of the child; and

> (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2 . . . of this chapter.

Indiana Code Section 31-14-13-2 contains factors that the trial court must consider when making a custody order, namely:

> (1) The age and sex of the child.

> (2) The wishes of the child's parent or parents.

> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a [*de facto*] custodian . . . .

Finally, Indiana Code section 31-14-13-2.3(c) contains factors that are pertinent to joint legal custody. Those factors are:

(1) the fitness and suitability of each of the persons awarded joint legal custody;

(2) whether the persons awarded joint legal custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint legal custody;

(5) whether the persons awarded joint legal custody:

(A) live in close proximity to each other; and

(B) plan to continue to do so;

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint legal custody; and

(7) whether there is a pattern of domestic or family violence.

[21] Here, when establishing Father's paternity in 2013, the parties initially agreed to share joint legal custody. That arrangement was carried on in the parties' Mediated Agreement of 2015. However, in 2016, Father petitioned for a modification of that custody. On appeal, Father argues that the trial court should have granted him sole legal custody of the Child due to a change in the following substantial factors: (1) extreme discord and interactions between him and Johnson, Mother's fiancé; and (2) breakdown of communication between him and Mother.

### A. *Altercation Between Father and Johnson*

[22] Before we address Father's argument, we note that Father has waived his claim on appeal. *See* Indiana Appellate Rule 46(A)(8)(a). Father's argument is devoid of any analysis or citations from appropriate parts of the record.

Although Father waived his issue for appeal, we address the matter considering the serious issue at stake.

[23] At the evidentiary hearing, Father offered a seven-minute video recording depicting him, Mother, and Johnson arguing. The recording occurred at Mother's and Johnson's home when Father had gone to pick up the Child. Father testified that he made the recording since he "anticipated" that the pickup "wasn't going to be pleasant in some fashion." (Tr. Vol. I, p. 94). Father stated that neither Mother or Johnson knew that he was recording the event, and he admitted that he "made that recording for purposes of litigation." (Tr. Vol. I, p. 113).

[24] In the recording, Mother and Father are heard arguing about Father's summer parenting time. Mother first claims that for "three days," she had repeatedly demanded the dates from Father. (Tr. Vol. I, p. 96). Father is then heard stating, "I don't have it wrote down yet. We'll figure it out." (Tr. Vol. I, p. 96). Based on Father's response, Johnson interjects and tells Father, "[Y]ou should probably not speak like that . . . . This is my property." (Tr. Vol. I, p. 96). Father is then heard telling Johnson, "I have a right to be here." (Tr. Vol. I, p. 96). Within moments, the confrontation intensifies where Johnson accuses Father of fabricating parenting time issues to the trial court in order get favorable orders, and Johnson calling Father "a lying mother fucker." (Tr. Vol. I, p. 96). In an attempt to dissolve the conflict between Father and Johnson, Mother is heard offering Father the Child's bag so that Father could leave. At that point, Johnson asks Father, "[A]re you letting us come get [the Child]

tomorrow." (Tr. Vol. I, p. 97). Father then responds by stating, "[T]here's no we to this." (Tr. Vol. I, p. 97). Father and Johnson again quarrel, and Mother once more tries to quell the two. Mother is then heard summoning the Child, "[C]ome here, baby girl. [Johnson], stop. [The Child] is coming. I don't want her to see anything." (Tr. Vol. I, p. 98). At the very end of the recording, Father is seated in his car, and referring to his lawyer, Father declares, "Yvonne, I'm coming to see you." (Tr. Vol. I, p. 101).

[25] Additionally, Father testified that at the beginning of the recording, the Child was "in the house," however, during the verbal altercation, the Child was outside "running around . . . maybe 15 to 20 feet" away. (Tr. Vol. I, pp. 92, 94). During cross examination, Father testified that, at the end of the recording, Mother had to leave the area where Father and Johnson were arguing in order to retrieve the Child.

[26] In the finding relating to the discord between Father and Johnson, the trial court stated:

> 5. There has been·at least one verbal confrontation between Father and Mother's fiancé and a telephone video recording of that event was part of the evidence during the October 11, 2017 hearing. The [c]ourt finds that the confrontation had no demonstrated effect on the [C]hild, and in fact the [c]ourt was unable to determine if the [C]hild was even aware of the confrontation at all. The [c]ourt further finds that the verbal confrontation was precipitated by the Father, that Father went to the child exchange intending to provoke such a verbal confrontation, and that his concluding comment on the recording which was to the effect of "Yvonne I'm coming to see you." (a

reference to . . . Father's counsel) clearly illustrates, when combined with the fact that the Father was prepared to begin video recording the event upon his arrival, that the whole affair was, for lack of a better term a "set up." Based upon the evidence concerning this event, as well as the [c]ourt's careful observations of the presentation and demeanor of both Father and Mark Johnson during their testimony the [c]ourt finds that the verbal confrontation event does not constitute substantial change as contemplated by I.C. 31-17-2-21.[3] The [c]ourt views this event as an attempt by Father to generate evidence and not as an accurate representation of the historical pattern of interaction between Father and Mark Johnson.

(Appellant's App. Vol. II, p. 152). Here, we find that the trial court, as the trier of fact, heard evidence from the parties, listened to Father's recording, and concluded that the recording was a staged event. Specifically, the trial court found that Father's statement "Yvonne I'm coming to see you," accompanied by Father's actions of recording the incident, were not innocuous. (Appellant's App. Vol. II, p. 152). Father's appellate arguments are, at best, simply a request to substitute our judgment for that of the trial court, which we will not do. *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016).

B. *Breakdown of Communication between Father and Mother*

---

[3] As noted, this statute applies to modification of custody in dissolution actions. Custody modifications in paternity actions are governed by Article 14 of Title 31. Although the trial court's citations to Article 17 is incorrect, the trial court's decision is unaffected as the legal standards included in Article 14 are, in pertinent part, identical to those in Article 17.

[27]    Next, Father contends that the trial court erred by not finding that the parties inability to agree on where the Child should attend school, as a substantial factor that would necessitate modification of legal custody. In his appellate brief, Father first claims that the parties' "inability to communicate could not have been at a worse time because the [C]hild was school-aged and unable to attend the school where they had previously agreed that she would attend, so the parties' inability to communicate to determine which school the [C]hild should enrolled is such a significant change in circumstance." (Appellant's Corrected Br. pp. 33-34).

[28]    With respect to issues relating to the Child's schooling, the trial court determined that

> failure to enroll the Child in Montessori school does not constitute substantial change under I.C. [§] 31-17-2-21. An attempt was made to enroll the [C]hild in the Montessori school and she was deemed to be inappropriate for enrollment. Father then unilaterally enrolled the [C]hild in public school. The public school the [C]hild attends is not substantially different in distance from Father's home than the Montessori school, is in Father's home geographical area and Mother has voiced no objections to the enrollment in public school. That the parties' child did not demonstrate the necessary attributes for Montessori enrollment is a factor not under the control of either party, and at best demonstrates that parents' hopes and aspirations for their child are sometimes not realized.

(Appellant's App. Vol. II, p. 152).

[29]     As noted, the Mediated Agreement entered by the parties in 2015 provided that the Child would be enrolled in Oak School for kindergarten. Father had attempted to enroll the Child at Oak School; however, the school was not a great fit for the Child. Since the Child could not be admitted at Oak School, Father, exclusively enrolled the Child in a public school near his home without Mother's consent. Notwithstanding Father's unilateral action, Mother did not object to the placement. In fact, Mother testified that she took the Child to her school activities, that the Child "loves going" to her school, and was also doing well academically. (Tr. Vol. I, p. 105). Contrary to Father's claim that the breakdown of communication on issues pertaining to the Child's schooling had reached a tipping point and that joint custody was unworkable, the trial court weighed the evidence and found that legal joint custody remained a viable option for the parties. *See Swadner v. Swadner*, 897 N.E.2d 966, 974 (Ind. Ct. App. 2008) (affirming grant of joint legal custody where parties "demonstrated their general ability to communicate and work together to raise their children"). As with most matters concerning custody, "[w]e have no way of knowing whether this arrangement will work or not; only time can tell." *Walker v. Walker*, 539 N.E.2d 509, 513 (Ind. Ct. App. 1989).

[30]     Mother then cites to *Pierce v Pierce*, 620 N.E.2d 726, 731 (Ind. Ct. App. 1993), where we held that "[a] parent may not sow seeds of discord and reap improved custody rights." Mother contends that the same legal incentive in *Pierce* should be applied in the instant case. We agree. As noted, Father's subsequent actions of unilaterally enrolling the Child at the public school without Mother's input

increased hostility between the parties. Although Mother later consented to the Child's placement, Father excluded Mother from the school contact list, and denied Mother online access to the Child's school work. If the record before us demonstrates anything, it is that by the nature of Father's own actions, he sowed the seeds of discord with respect to the Child's schooling, and he should not now earn improved custodial rights. Based on the record, the trial court's order continuing joint legal custody is not clearly erroneous.

### III. *Modification of Parenting Time*

A decision modifying parenting time is reviewed for an abuse of discretion. *Miller,* 965 N.E.2d at 108. When reviewing the trial court's decision, we neither reweigh the evidence nor reexamine the credibility of the witnesses. *In re Paternity of W.C.*, 952 N.E.2d 810, 816 (Ind. Ct. App. 2011). Reversal is appropriate only upon a showing of an abuse of that discretion. *Walker v. Nelson*, 911 N.E.2d 124, 130 (Ind. Ct. App. 2009). No abuse of discretion occurs if there is a rational basis supporting the trial court's determination. *Gomez v. Gomez.* 887 N.E.2d 977, 983 (Ind. Ct. App. 2008).

On appeal, Father argues that the parties' Mediated Agreement of 2015 "specifically prevented midweek overnight parenting time for Mother during the [C]hild's school week . . . Yet, the court-imposed parenting time schedule ordered on November 15, 2017 does not limit midweek parenting time as the parents had agreed." (Appellant's Corrected Br. p. 27). Father continues to state that the November 15, 2017 Order, requires the Child, a "seven-year-old[,] to travel throughout the school week for more than forty-five minutes each

direction, to and from school with . . . Mother, at least three days per week, which is contrary to the [C]hild's best interest." (Appellant's Corrected Br. p. 16). Then referencing Indiana Code Section 31-14-13-2, the custody modification statute, Father posits that the trial court

> found no basis *of changed circumstances to modify the parenting time schedule* and then modified the parenting time schedule substantially by substituting its own judgment for that of the parents' judgment, [] is contrary to the law.

(Appellant's Corrected Br. p. 28). (emphasis added). Mother counters Father's argument by asserting that the trial court did not modify custody, rather, it modified parenting time. Mother then correctly notes that "modification of parenting time is governed by Ind. Code § 31-14-14-2, which allows modification of parenting time only if it serves the minor child's best interest. (Appellee's Br. pp. 19-20). Mother additionally argues that the November 15, 2017 Order,

> bears no substantial deviation from the parenting time which was in effect at the time Father filed his Verified Motion, but rather reallocates on which days Mother may exercise her parenting time. The parenting time schedule in the November 15, 2017, Amended Order, just like the parenting time schedule in effect at the time Father filed his Verified Motion, awards 50/50 parenting time to Mother and Father.

(Appellee's Br. p. 21). Mother draws this argument from the November 15, 2017 Order, where the trial court held that while it was denying Father's request to modify legal custody and parenting time, it

cannot ignore the fact that the evidence presented demonstrated the need for *additional Orders in aid of the September 2, 2015 custody Order.* Such Orders are not a modification of the September 2, 2015 Order, but are designed to resolve conflict and provide for the stable and consistent parenting of the parties' minor child.

*Order on Parenting Time Schedule*

In respect to parenting time the Court ORDERS as follows:

a. Mother shall exercise alternating weekend parenting time commencing Friday when the . . . [C]hild is released from school, or on days when the . . . [C]hild does not have school at 12:00 p.m. until Monday morning when she is to be returned to school, or at 12:00 p.m. on days when she does not have school;

b. Mother shall exercise overnight, midweek parenting time commencing Wednesday when the . . . [C]hild is released from school, or on days when she does not have school at 12:00 p.m. until Friday morning when she is to be returned to school or at 12:00 p.m. on days when she does not have school and it is not her weekend;

c. Mother is responsible for providing transportation to and from school or any other mutually agreed child exchange location on all of her days of parenting time;

d. On days when it is not feasible to exchange the . . . [C]hild at school, the parties shall select a mutually agreeable neutral exchange point that shall be a public location, unless otherwise agreed by the parties;

e. On such occasions when the . . . [C]hild does not have school, is sick, or it is an e-learning day, when Father's schedule does not

allow for him to be present with the . . . [C]hild for a period of three hours or more, he is to offer the opportunity for additional parenting time to Mother first and consistent with the provisions of the Indiana Parenting Time Guidelines.

(Appellant's App. Vol. II, pp. 161-62) (emphasis added).

[33] Notwithstanding the trial court's holding that it was not modifying parenting time, we find the additional orders undeniably modified the parties' parenting schedule. As noted, Mother's parenting time, as per the Mediated Agreement of 2015, called for Mother to exercise parenting time every weekend from Friday after school until Sunday at 6:00 p.m., and midweek when the Child got off from school until 7:30 p.m. Based on that previous schedule, in a two-week period, Mother had four overnights. In the November 15, 2017 Order, Mother's overnights within a two-week period increased from four to seven. Because parenting time was modified, we now review the trial court's decision for abuse of discretion. *See Miller,* 965 N.E.2d at 108.

[34] In the instant case, we find that sufficient evidence supports the trial court's *de facto* modification of the previous parenting time schedule and that it was in the Child's best interest. Evidence was presented that just a few days before the Default Order in June 8, 2016, where Father was granted sole legal custody of the Child, Father unilaterally enrolled the Child at J.E. Ober, a public school located near his home. Father then refused to provide J.E. Ober school with Mother's contact information. Despite Mother's later consent to the unilateral placement of the Child in her new school, Mother visited the school and

compelled Father to list her on the contact list. Additionally, Father had refused to give Mother access to PowerSchool (an online teaching platform) which would allow Mother to keep track of the Child's school work.

[35] Beside Father's concerted efforts to oust Mother from the Child's education, Mother testified that she emailed the Child's teachers and additionally dropped some "self-addressed envelopes" so that she could be mailed important papers that get sent home" with the Child. (Tr. Vol. I, p. 202). Mother further claimed that she was getting the "bare minimum . . . according to the parenting time guidelines [] every other weekend, . . . Friday I pick her up from [Father] at 4:00 [p.m.] and then Sunday he comes and gets her at 6:00 p.m. and then my mid-week parenting is Thursday 4:00 to 8:00 [p.m.]" (Tr. Vol. I, p. 198). Mother indicated that if her parenting time was modified, "not only would [she] be getting cut out of [the Child's] school environment but [she] also wouldn't be getting enough time" with the Child. (Tr. Vol. I, p. 214). When asked why that was important, Mother stated, "Cause [sic] I want to be part of her life and I want to be in her life and spend as much time with her as possible." (Tr. Vol. I, p. 214). Further, because Mother and Father lived about forty minutes from each other, Mother was asked if she was concerned about the driving distance, Mother responded by stating, "I don't think the distance outweighs how important my relationship with my daughter is." (Tr. Vol. I, p. 205). Moreover, the record establishes that Mother did not work, therefore she had more time to spend time with the Child, and that the Child was closely bonded with her younger half-brother.

The preamble of the Indiana Parenting Time Guidelines, provides, in part, that "[I]t is usually in a child's best interest to have frequent, meaningful, and continuing contact with each parent." There was evidence presented to the trial court that Father had exhibited a consistent pattern of attempting to thwart Mother's relationship with the Child especially with regard to the Child's schooling. While fashioning the new parenting schedule, it is clear from the record that Mother desires, not simply the minimum parenting time, but to be actively involved in the Child's life. It is reasonable to conclude that the trial court found that by allowing Mother to have a mid-week parenting time, it would enable Mother to be involved in the Child's school work, and spend more quality time with the Child. While Father may disagree with the amount of attention that the trial court devoted to Mother's testimony, we are not in a position to second-guess the trial court's assessment in this regard. Therefore, we decline to set aside the trial court's modification of the parties' parenting time schedule.

## IV. *Admission of the Evidence*

Father also argues that the trial court abused its discretion by admitting evidence from the prior custody determination. The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*. An abuse of discretion only occurs where the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id*. "The fact that evidence was erroneously admitted does not automatically require reversal, and we will reverse only if we conclude

the admission affected a party's substantial rights." *Id*. "In general, the admission of evidence that is merely cumulative of other evidence amounts to harmless error as such admission does not affect a party's substantial rights." *In re Paternity of H.R.M.*, 864 N.E.2d 442, 450-51 (Ind. Ct. App. 2007). Lastly Indiana Code section 31-14-13-9 provides, in part, that "[I]n a proceeding for a custody modification, the court may not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child."

[38] Father contends that he objected when Mother's counsel questioned him on the parenting time schedule that existed prior to the last custody order, *i.e.*, the Mediated Agreement of September 2, 2015. Father contends that while the trial court "verbally sustained" his objection, it "invited Mother's counsel to pick up the deposition document and read it into the record—which Mother's counsel then did." (Appellant's Corrected Br. p. 42).

[39] Regarding Father's allegation, during cross examination, Mother's counsel asked Father whether Mother had exercised equal parenting time between September 2015, and the Default Order of 2016. Specially, Mother's counsel asked Father, "[Mother] was continuing to get every weekend when she got them ever since . . . at least December, if not May of 2013, right?" (Tr. Vol. I, p. 124). Father then stated, "[A]ctually, I'll say it is from September of 2015 . . . And, the 50/50 didn't start getting pushed . . . until late 2015." (Tr. Vol. I, p. 124). Mother's counsel then asked, "So, are you changing your testimony from

your deposition?" (Tr. Vol. I, p. 124). To which, Father responded, "Yes." (Tr. Vol. I, p. 124).

[40] Referring to the Agreed Entry dated December 30, 2013, Mother's counsel then questioned Father, "[O]n your Deposition, and we'll backtrack here, on December 30th [Mother] was exercising parenting time every weekend and you and her were splitting special events." (Tr. Vol. I, p. 125). Father's counsel subsequently objected by asserting, "[M]y objection is, is that [Mother's counsel] is again soliciting information that happened prior to September 2, 2015. (Tr. Vol. I, p. 125). Furthermore, Father's counsel argued that Mother's counsel had not filed a motion to publish the deposition. In response, Mother's counsel contended that publication was not necessary. Following counsel's arguments, the trial court ruled that

> We discussed the publication of [d]epositions and whether to have to review them. I remember we talked about that. You're, you're not precluded from picking up the [d]eposition and reading it to him and examine him on it and things like that, though.
>
> ****
>
> So I'm gonna sustain the objection to that extent. But I'm not shutting you down with picking up your document and –

(Tr. Vol. I, p. 126). Based on the above ruling, Mother's counsel then cross-examined Father as follows:

. . . my question to you was, so after the Order was entered December 30, 2013, things were still going okay with the splitting of the special holidays, parenting time, stuff like that? Your response was, right. Question: She was getting every weekend. Is, is that, and you interrupted me and you said, yes. You continued on and said, the best I can remember she was picking her up on Fridays and then I believe, then I would, I believe, sometimes it would be like Friday morning or if it didn't start on Friday morning, it would be, it would become a Friday morning and then she would keep her until Sunday night or sometimes a Monday, right?

A. Correct.

Q. So, [Mother] was getting [the Child] every weekend as of December 23, or 30, 2013?

(Tr. Vol. I, p. 126). At that point, again, Father's counsel objected, contending that the Mother's counsel was trying to solicit evidence that occurred prior to the Mediated Agreement of September 2015. Mother's counsel, in turn, argued, "[I]'m impeaching [Father] because he states something different today than" what he "testified about in his [d]eposition." (Tr. Vol. I, p. 127). Following both arguments, the trial court overruled Father's objection and further explained to Father's counsel that Mother's counsel is

trying to impeach. He, he got an inconsistent answer from what he believes is in the [d]eposition. He's simply impeaching. In other words, he's not really trying to establish the evidence. He's trying to establish inconsistent testimony.

(Tr. Vol. I, p. 127). Under our rules of evidence, a party may impeach a witness by extrinsic evidence of a prior inconsistent statement. Ind. Evidence Rule 613(b). "This rule permits prior inconsistent statements by the person being impeached." *Id*. We note that impeachment serves an entirely different purpose from general admission of evidence. When Father stated at trial that parenting time had changed on September 2, 2015, Father contradicted his deposition testimony and thereby opened the door for the use of his deposition for impeachment purposes. As such, the trial court properly admitted the evidence, in accordance with Indiana Evidence Rule 613, and therefore, Father's claim fails. *See also Martin v State*, 736 N.E.2d at 1213, 1217 (Ind. 2000).

## V. *Child Support Order*

[41] Lastly, Father argues that the trial court erred in calculating some aspects of his child support obligation. We presume a trial court's calculation of child support is valid and we review its decision for an abuse of discretion. *Thompson v. Thompson*, 811 N.E.2d 888, 924 (Ind. Ct. App. 2004), *trans. denied*. The trial court abuses its discretion if its decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id*. This broad discretion, however, "must be exercised within the methodological framework established by the guidelines." *Quinn v. Threlkel*, 858 N.E.2d 665, 670 (Ind. Ct. App. 2006). Father particularly alleges that the trial court erred: (1) in calculating his weekly gross income; (2) by awarding

Mother subsequent born child credit; and (3) by failing to award him credit for the Child's health insurance.

## A. *Father's Weekly Gross Income*

At trial, Father testified that for about twenty years, he has worked at RD Rubber Products in Garrett, Indiana. He indicated that he earns $17.00 per hour for [r]ight about 30" hours per week. (Tr. Vol. I, p. 118). Father later testified that he had the option of working forty hours per week, but he worked about thirty hours.

The child support obligation worksheet, as calculated by the trial court, shows that Father's weekly gross income is $680.00. The trial court unquestionably arrived at Father's weekly gross income by determining that Father could, in theory, work forty hours per week ($17.00 X 40 hours). Father posits that because he currently works about thirty-two hours per week at $17.00 per hour, his correct weekly gross income should have been $544.00, instead of $680.00.

Indiana Child Support Guideline 3(A)(1) provides the framework for a court to determine the amount of child support based upon weekly gross income and states that "'weekly gross income' is defined as actual weekly gross income of the parent if employed to full capacity, potential income if *unemployed or underemployed*, and imputed income based upon 'in-kind' benefits." Child Supp.G.3(A)(1) (emphasis added).

Regarding potential income, the Guidelines state:

If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community. If there is no work history and no higher education or vocational training, the facts of the case may indicate that Weekly Gross Income be set at least at the federal minimum wage level.

Child Supp.G.3(A)(3). The commentary to Guideline 3(A) cautions courts to use "a great deal of discretion" in making a determination of potential income. Child Supp.G.3(A) cmt. 2(c). It describes two purposes for making a potential income determination, including "to discourage a parent from taking a lower paying job to avoid the payment of significant support" and "to fairly allocate the support obligation when one parent remarries and, because of the income of the new spouse, chooses not to be employed." *Id.* This court has observed that, "[w]hile the Guidelines clearly indicate that a parent's avoidance of child support is grounds for imputing potential income, it is not a necessary prerequisite," noting that, the commentary suggests as an example that finding potential income may be appropriate where a parent "is unemployed by reason of involuntary layoff or job termination . . ." *In re Paternity of Pickett*, 44 N.E.3d 756, 766 (Ind. Ct. App. 2015). The commentary also observes that attributing potential income can result in unrealistic support obligations which could be contrary to the best interests of the children and provides six examples to

illustrate some of the considerations affecting whether to attribute potential income to a parent. Child Supp.G.3(A) cmt. 2(c).

[46] At the custody modification hearing, Father presented a history of his income. Moreover, Father expressed that while he currently works about thirty hours per week, "there's been times where, yes, I've worked 40 hours a week. Sometimes a lot more." (Tr. Vol. I, p. 159). During Father's cross-examination, the following exchange occurred:

> [Mother's Counsel]: So, so you could work 40 hours a week now if you wanted to?
>
> [Father]: Yes.
>
> [Mother's Counsel]: You just, you've, you've not sought to do that? It's available to you?
>
> [Father]: Correct, yes.
>
> [Trial Court]: Hold on a second. Would you do more work for your employer or would you just lengthen the amount of time you were at work?
>
> [Father]: Yeah, I would work really slowly doing the same thing to make it 40 hours.
>
> [Trial Court]: But you wouldn't benefit your employer in any way by working[?]
>
> [Father]: No.

> [Trial Court]: [] 40 hours?  Okay.  I understand what you're
> saying.  Alright.

(Tr. Vol. I, pp.159-160).  Here, we find no evidence that the trial court improperly applied the child support guidelines after it imputed Father's potential income based on his own admission that he was intentionally underemployed.  *See* Ind. Child Supp. G.3(A).  It is apparent that the trial court considered and weighed Father's testimony and judged his credibility about why he worked less and that he could potentially work more hours.  Thus, we decline to set aside the trial court's finding that Father's weekly gross income is $680.00.

### B. *Subsequent Born Credit*

[47]   Mother has a subsequent born child fathered by Johnson.  Father argues that the trial court erroneously awarded Mother a subsequent born child credit, when the evidence shows that Mother does not work and Johnson financially supports the subsequent born child.

[48]   Pursuant to Indiana Child Support Guideline 3(C), after weekly gross income is determined for each parent, certain reductions are allowed in computing weekly adjusted income, which is the amount upon which child support is based.  These reductions include court orders for support of children (1) born or legally adopted subsequent to the birthdates of the children subject of the child support order; and (2) that parent is actually meeting or paying that obligation.  *See* Child. Supp. G.3(C)(1).  Father contends that Johnson testified that he had "directed Mother not work, and that he gave her money for groceries, gas

money and that she stays at home and babysits" the Child, and subsequent born child. (Appellant's Corrected Br. p. 38). Father maintains that "Mother does not actually meet or pay the obligation for her subsequent child so the child support should not be adjusted in that way for that obligation." (Appellant's Corrected Br. p. 38).

[49] The commentary in Indiana Child Support Guideline 3(C) provides that after the weekly gross income is determined, certain deductions are allowed to arrive at the weekly adjusted income. The commentary provides a two-step process in computing weekly adjusted income. The first step is to determine the number of subsequent born children and the parent seeking the adjustment has the burden to prove that support is actually paid. *See* Child. Supp. G. 3(C)(1) and Comm. 3(C). The second step is to calculate the subsequent child credit by multiplying the parents weekly gross income by the use of a multiplier that reduces the parent's weekly gross income. Child. Supp. G. 3(C)(1) and Comm. 3(C). We note that the multiplier varies by the number of subsequent children, for example, 0.065 for one subsequent child and 0.097 for two subsequent children.

[50] Although Mother was unemployed, the trial court imputed $290 as her weekly gross income. Mother has one subsequent born child that lives in her household, and the trial court employed the corresponding multiplier of 0.065, thereby adjusting Mother's weekly gross income to $271.15. As noted, Mother is unemployed and stays at home to raise the Child and subsequent born child. It is undisputed that Johnson takes care of their living expenses. Father is

correct by stating that pursuant to Indiana Child Support Guideline 3(C)(1), Mother does not *actually meet or pay* the obligation for her subsequent child. Therefore, we conclude that the trial court abused its discretion by adjusting Mother's weekly gross income and we reverse that determination.

### C. *Insurance Premiums*

[51] Finally, Father contends that the trial court erred by failing to credit him for the Child's health insurance premium. We agree. The Child Support Guidelines provide that, generally, a parent should receive a health insurance credit in an amount equal to the premium cost the parent actually pays for a child's health insurance. *Julie C.*, 924 N.E.2d at 1261; *see also* Ind. Child Support Guideline 3(E)(2). In the November 15, 2017 Order, the trial court held that "Father did not testify as to any health insurance costs he pays in relation to the [C]hild." (Appellant's App. Vol. II, p. 157).

[52] While Father did not specifically state the amount of insurance premium he pays for the Child, he testified that he held insurance coverage on behalf of the Child, and Mother positively confirmed this fact at the custody modification hearing. As such, we remand on this issue so that—upon proof of the actual amount of health premium Father pays for the Child—the trial court should credit Father for the Child's health insurance premium.

## CONCLUSION

[53] Based on the foregoing, we hold that the trial court (1) did not abuse its discretion by denying Father's motion for modification of joint legal custody to

sole legal custody; (2) did not abuse its discretion by modifying the parties' parenting schedule; and (3) it did not abuse its discretion in admitting certain evidence. However, we reverse and remand to the trial court for a recalculation of Father's weekly gross income consistent with this opinion.

Affirmed in part, reversed in part, and remanded with instructions.

May, J. and Mathias, J. concur